Commonwealth ex rel. Gryger, Appellant, *v.* Burke.

Argued November 23, 1953. Before STERN, C. J., STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

Herman I. Pollock, Voluntary Defender, with him Miles Warner, Assistant Voluntary Defender, for relator, appellant.

Randolph C. Ryder, Deputy Attorney General, with him Frank P. Lawley, Jr., Assistant Deputy Attorney General and Frank F. Truscott, Attorney General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ARNOLD, October 8, 1954:

This is an appeal from the order of the Superior Court reversing the court below which had granted a writ of habeas corpus.

On November 27, 1944, Gryger was brought before Judge KUN in the Court of Quarter Sessions of Philadelphia County, to answer a charge under the Act of June 24, 1939, P. L. 872, Section 1108 (b), 18 PS §5108 (b), charging him with being a fourth offender.

After Gryger admitted that he was the person named in the records, Judge KUN sentenced him to life, saying: "The law is that a person who has been found guilty of felony four times within the periods prescribed must be punished, because of those successive convictions . . . I have to do my duty under the law . . . I don't see any point in further discussion because the case seems very clear and it becomes my duty and I now pronounce sentence: that you undergo life imprisonment in the Eastern State Penitentiary, and the sentence of February 25th, 1944, is vacated in accord-

ance with the provisions of the Act of Assembly when sentence is life imprisonment." On February 23, 1945, the prisoner wrote a letter to this Court complaining that he had not received a fair trial in the "fourth offender" proceeding. The letter was treated as a petition for a writ of habeas corpus and denied on March 19, 1945. But the question was not raised in that case, as in the present proceeding, that Judge KUN had treated the matter of sentence as being mandatory.

On October 1, 1945, Gryger again applied for a writ of habeas corpus which was refused on the grounds that it was premature. Between that date and May 28, 1947, the defendant submitted four different communications in the nature of petitions for habeas corpus, all of which were denied either in this Court or in the court of quarter sessions.

In April, 1948, Gryger appealed to the Supreme Court of the United States from the decision of this Court, asserting that the Federal Constitution required Pennsylvania to release him under the due process of law clause because (1) he was sentenced as a fourth offender without counsel or offer of counsel; (2) one of the convictions on which his sentence was based occurred before the enactment of the Pennsylvania Habitual Criminal Act; and (3) that sentencing under the Act unconstitutionally subjected him to double jeopardy. On June 14, 1948, the Supreme Court of the United States affirmed the decision of this Court in denying the writ of habeas corpus.

On the proposition submitted by Gryger that the sentencing judge erred in assuming that the Pennsylvania Habitual Criminal Act made it mandatory for him to impose a life sentence, the United States Supreme Court said (334 U. S. 728, at page 731) : "But there is nothing to indicate that he [the sentencing judge] felt constrained to impose the penalty except

as the facts before him warranted it. And *it in any event is for the Pennsylvania courts to say under its law what duty or discretion the court may have had."* (Italics supplied).

On March 21, 1949, the prisoner renewed in this Court his efforts for a writ of habeas corpus, charging that the district attorney who prosecuted him and the attorney who defended him in 1944, had failed in their respective constitutional duties toward him. We dismissed this petition on May 28, 1949.

In July, 1949, the prisoner attempted unsuccessfully to have the United States District Court for the Eastern District of Pennsylvania take jurisdiction of his case.

On October 9, 1951, the prisoner filed another petition for writ of habeas corpus in the Court of Quarter Sessions of Philadelphia County, alleging that the fourth felony conviction violated due process in that he was tried and sentenced twice on the same indictment.

On November 9, 1951, the Court of Quarter Sessions of Philadelphia County held that the conviction was "constitutionally unassailable" and an appeal to the Superior Court was later withdrawn. On February 6, 1952, the prisoner appealed for a rehearing before the same court (Judge LEVINTHAL) and the rehearing was granted. Judge LEVINTHAL now took extensive testimony, hearing the prisoner as well as the attorney who had defended him. He also examined the various records of the court proceedings which led to the sentence of November 27, 1944.

After a thorough hearing Judge LEVINTHAL granted the writ of habeas corpus, vacated the life sentence pronounced on November 27, 1944, and reinstated the sentence of February 25, 1944, thus giving the prisoner the status of a fourth offender unsentenced under the

Habitual Criminal Act. The district attorney of Phila-
delphia County had not opposed the granting of the
writ; however the Attorney General interceded and ap-
pealed the decision to this Court, which remitted the
case to the Superior Court. That Court reversed Judge
LEVINTHAL'S decision and reinstated the life sentence.
This Court granted an appeal and the case was heard
by us.

The Pennsylvania Habitual Criminal Act of June
24, 1939, P. L. 872, §1108, 18 PS §5108, provides that
any sentence thereby imposed "shall be reviewable on
appeal by the Supreme or Superior Courts, *not only
as to alleged legal errors but also as to the justice
thereof*. Where any such defendant is indigent, the
costs of appeal, together with reasonable counsel fee,
shall be paid by the Commonwealth." (Italics sup-
plied). There was no evidence that the defendant was
"cautioned as to his rights," as provided by the Act.
In view of the state's assumption of the expenses in-
volved, an appeal would have been lodged to the court
had the question following been raised.

More than once Judge KUN indicated that his sen-
tence of life was limited to the identification of the
prisoner and the acknowledgment of the four offenses.
He said: ". . . on the basis of the record in each of
these cases, and on the basis of your acknowledgment
of identity, it becomes my *duty,* under the Act of As-
sembly, to treat such a case that is to say, where a
person has been found guilty the fourth time of a
felony within the prescribed period, to impose the sen-
tence required by the Act." (Italics supplied).

. We think it was never the intention of the legisla-
ture that the commission of a fourth offense would
make it the duty of the court automatically to impose
a life sentence. The whole phraseology of the Act pre-
supposes a judicial hearing, which would mean an

examination of the life history of the defendant. Thus the statute provides for an appeal "as to alleged legal errors," and "as to the justice thereof [the life imprisonment]." When the fourth offender statute was enacted, the Commission of the Legislature appointed to study this phase of the New York Baumes Act reported:

"The Baumes Act requires a judge to sentence a fourth offender in certain cases of felony to life imprisonment, leaving no discretion whatsoever to the court. This Commission has considered the matter carefully and is not at all convinced that it is wise to take such a drastic step as to tie the hands of the court, even though a man may be convicted of his fourth major offense. It is as true that some men should be imprisoned for life after their first offense as unregenerate criminals as it is true that other men after the commission of their fourth offense should not be locked up for the balance of their natural lives.

"When this matter was submitted to the Judicial Conference of this Commonwealth called by Chief Justice VON MOSCHZISKER it was unanimously resolved that it was the sense of the conference that a system of increasingly graduated penalties should be imposed, dependent upon the number of former convictions of the accused.

"This thought has been introduced into the Act now presented by this Commission, with permission vested in the trial judge to sentence to life imprisonment for a fourth conviction. Not only is such a sentence *not made mandatory upon the judge,* but the propriety of such a sentence is reviewable by the upper court." (Appendix to the Legislative Journal of 1929, Vol. III, pp. 6156-57) (Italics supplied).

Furthermore, the fourth offender's Act actually states that under the circumstances there outlined the

life sentence should be imposed "in the discretion of the judge trying the case." (Act of June 24, 1939, P. L. 872, Section 1108 (b), 18 PS §5108 (b)). We quote with approval from Judge LEVINTHAL'S observations in the court below: ". . . every Pennsylvania fourth offender enjoys the right to a full hearing on the question of the propriety of a life sentence in his particular case. A judicious determination of this matter must be based upon an understanding of the defendant's background, the extent of his education, his age, mentality, temperament and health, as well as a consideration of the several crimes of which he stands convicted, their tendency to show antisocial characteristics, their violent or non-violent nature, the presence or absence of confederates, the motive for their commission, the amount of money or other property involved, and all the other factors and circumstances bearing upon the ultimate decision whether the interests of justice and the welfare of society require that the particular individual be incarcerated for the balance of his life."

Judge LEVINTHAL found specifically as a fact that: "The following remarks of the sentencing judge, appearing in the official transcript of the hearing, make it perfectly clear that he considered it as his statutory duty to impose a sentence of life imprisonment, without regard to any of the surrounding circumstances." Judge LEVINTHAL, therefore, found as a fact that which the Supreme Court of the United States had not found, that is, that the sentencing judge considered the sentence mandatory. He also found as a conclusion of law that under the Act the sentence was not mandatory.

The judgment of the Superior Court must be reversed and the judgment of the Court of Common Pleas of Philadelphia County reinstated, the effect of

which was to vacate the sentence imposed by Judge KUN on November 27, 1944, and to reinstate the sentence of February 25, 1944, thus giving the prisoner the status of a fourth offender unsentenced. We must state, however, that the relator had been indicted on June 23, 1943, on charges of aggravated assault and battery arising out of a brawl with which he was erroneously charged. He was further indicted on twelve bills Nos. 251-262, July Sessions, 1943, each charging him with receiving stolen goods. On July 26, 1943, he pleaded guilty to the charge of receiving stolen goods in each of the last mentioned twelve bills. He was represented by counsel at the time. Following an unsuccessful attempt to escape from prison for which he was also sentenced, he was later brought to trial on bills Nos. 461 and 462 June Sessions, 1943, on February 25, 1944. After trial in which he was represented by counsel he was convicted on both bills and sentenced to the Eastern Penitentiary. On May 4, 1944, a proceeding was instituted charging him with having committed a fourth felony within five years of the last prior felony conviction of the crimes specified in Section 1108 (a) of The Penal Code, 18 PS §5108 (a).

Judgment is reversed and the case is remitted with a procedendo in accordance with this opinion.

---

OPINION BY MR. JUSTICE MUSMANNO, CONCURRING AND DISSENTING IN PART:

On November 27, 1944, Francis J. Gryger, without counsel to advise or defend him, was brought before Judge KUN in the Court of Quarter Sessions of Philadelphia County to answer to an information under the Act of June 24, 1939, P. L. 872, Sec. 1108 (18 PS Sec. 5108) charging him with being a fourth offender.

After Gryger admitted that he was the person named in the records, Judge KUN sentenced him to life imprisonment. In imposing the sentence, Judge KUN said, inter alia: "The law is that a person who has been found guilty of felony four times within the periods prescribed must be punished, because of those successive convictions . . . I have to do my duty under the law . . . I don't see any point in further discussion because the case seems very clear and it becomes my duty and I now pronounce sentence; that you undergo life imprisonment in the Eastern State Penitentiary, and the sentence of February 25th, 1944, is vacated in accordance with the provisions of the Act of Assembly when sentence is life imprisonment." On February 23, 1945, the prisoner wrote a letter to this Court complaining that he had not received a fair trial in the "Fourth Offender" proceedings. This letter was treated as a petition for writ of habeas corpus and denied on March 19, 1945.

On October 1, 1945, Gryger applied again for a writ of habeas corpus. This petition was refused on the ground that it was premature. Between that date and May 28, 1947, the prisoner submitted four different communications in the nature of petitions for habeas corpus, all of which were denied either in this Court or in the court of quarter sessions.

In April, 1948, Gryger petitioned the Supreme Court of the United States asserting that the Federal Constitution required Pennsylvania to release him on due process of law grounds because (1) he was sentenced as a fourth offender without counsel or offer of counsel; (2) one of the convictions on which the sentence was based occurred before the enactment of the Pennsylvania Habitual Criminal Act, thus making the statute unconstitutionally retroactive and ex post facto; and (3) that sentencing under this Act unconstitutionally subjected him to double jeopardy.

On June 14, 1948, the United States Supreme Court affirmed the previous denial by this Court of the petition for writ of habeas corpus, stating: "We cannot treat a mere error of state law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a state court on state law would come here as a federal constitutional question." (*Gryger v. Burke*, 334 U. S. 728)

On the proposition advanced by Gryger that Judge KUN erred in assuming that the Pennsylvania Habitual Criminal Act made it mandatory for him to impose a sentence of life imprisonment, the United States Supreme Court said: ". . . There is nothing to indicate that he [the sentencing Court] felt constrained to impose the penalty except as the facts before him warranted it. *And it in any event is for the Pennsylvania courts to say under its law what duty or discretion the court may have had.*" (Emphasis supplied.)

On March 21, 1949, the prisoner renewed in this Court his efforts for a habeas corpus writ, charging that both the district attorney who prosecuted him, and the attorney who defended him in 1944 had failed in their respective, constitutional duties toward him. A rule to show cause issued, the district attorney replied, and the petition was dismissed on May 28, 1949.

In July, 1949, the prisoner attempted unsuccessfully to have the United States District Court for the Eastern District of Pennsylvania take jurisdiction of his case.

On October 9, 1951, the prisoner filed still another petition for a writ of habeas corpus in the Court of Quarter Sessions of Philadelphia County, alleging that the fourth felony conviction on February 25, 1944, violated due process of law in that he was tried and sentenced twice on the same indictment. He asked that the sentence which formed the basis for the "fourth

offender" proceedings be set aside and that he be discharged. On November 9, 1951, the Court of Quarter Sessions held that the conviction complained of (at Bill No. 461, June Sessions, 1943) was "constitutionally unassailable."

An appeal from this decision was taken to the Superior Court, and then later withdrawn (January 31, 1952). On February 6, 1952, the prisoner petitioned for a rehearing before the same Court (Judge LEVINTHAL) and it was allowed. Judge LEVINTHAL now took extensive testimony, hearing the prisoner as well as the attorney who had defended him in July, 1943. He also examined the many records of the various court proceedings which cumulatively had led to the pronouncement of the life sentence on November 27, 1944.

After several hearings Judge LEVINTHAL on May 29, 1952, granted the writ of habeas corpus, vacated the life sentence of November 27, 1944, and reinstated the sentence of February 25, 1944, thus giving to the prisoner the status of a fourth offender unsentenced under the Habitual Offenders Act. The District Attorney of Philadelphia, who had not opposed the granting of the writ, accepted Judge LEVINTHAL'S decision as final. The Attorney General of the Commonwealth, however, interceded and appealed Judge LEVINTHAL'S decision to the Supreme Court of Pennsylvania which remitted the case to the Superior Court.

The case was argued before the Superior Court. On July 14, 1953, the Superior Court reversed Judge LEVINTHAL'S decision, dismissed the writ of habeas corpus, and reinstated the life sentence of November 27, 1944. The prisoner petitioned this Court for an allocatur from the Superior Court's decision. The allocatur was granted and the case was heard by us at the Philadelphia Session in November, 1953.

The time has obviously arrived for a final and just determination of the question which has now for almost ten years been knocking at the doors of many tribunals: Is the life sentence detention of Francis Joseph Gryger in the Eastern Penitentiary legal?

There can be no doubt whatsoever that Francis Joseph Gryger was denied due process of law when, on November 27, 1944, destitute of legal assistance and unadvised as to his rights, he was sentenced to an iron and concrete cell for the remainder of his natural life. Life imprisonment is but one step removed from execution and as the thought of sending one to his death without providing the services of an attorney offends against our sense of justice, so also should the concept of permanent deprivation of freedom, without the presence of counsel to advise and defend, be shocking to our moral as well as legal standards of fairness and constitutional correctness.

The Pennsylvania Habitual Offenders Act (June 24, 1939, P. L. 872, supra) provides that any sentence imposed thereby "shall be reviewable on appeal by the Supreme or Superior Courts, not only as to alleged legal errors but also as to the justice thereof. Where any such defendant is indigent, the costs of appeal, together with any reasonable counsel fee, shall be paid by the Commonwealth." It scarcely needs argument to convince reasoning intelligence that if the Legislature regarded a sentence of life imprisonment of such gravity that it imposed on the Commonwealth the expenses of appeal, the law certainly intended that the defendant should be guaranteed legal aid at the time of the trial which factually decides the matter of life imprisonment. To guaranty the integrity of the appeal and not of the trial is like underwriting the expenses for post-operative physicians and medicines

but making no provisions for the surgeon who is to perform the operation.

It so happens, however, that Gryger did not get the benefit even of an appeal from the imposition of the life sentence since the statutory limitation for a review of the trial expired before any appeal was thought of. There is no indication that any one informed Gryger that application for appeal had to be filed before any given date. He could well have believed that, with incarceration for life facing him, there would not be lacking time within which to ask the courts to reconsider his case. He could even assume that the authorities might in fact resent any haste on his part. In his mind an appeal to a higher court for modification of the life sentence could fall into the category of a petition to the Pardon Board for clemency, where a petition is scarcely ever filed until there is some substantial compliance with the original sentence. Certainly if Gryger had had an attorney to defend him, especially in view of the State's assumption of the expenses involved, an appeal would have been lodged. And it may be added, there is no evidence that the defendant was "cautioned as to his rights," as provided for in the Act of June 24, 1939, P. L. 872.

Considering the plethora of appeals, petitions and letters with which Gryger has bombarded the courts ever since the prison doors closed on him with apparent finality, there can be no doubt that he desired very much that the courts review and reconsider his case in its many incongruous and baffling phases.

The imperative need for counsel in fourth offender proceedings could not be more convincingly demonstrated than by the case at bar. When Gryger was asked by Judge KUN at the time of sentencing on November 27, 1944, if he had anything to say, Gryger

launched into a long and labored statement in which he endeavored to explain that he had not committed a fourth felony which would warrant the imposition of a life sentence. Obviously limited in formal education and completely ignorant of legal procedure, Gryger none the less protested, with such vigorous language as he could summon, against the hammer of doom about to descend upon him. The Court tried to enlighten the prisoner as to why he should willingly accept that doom, but after the prisoner continued his remonstrances, the district attorney remarked: "He does not understand," and the Court said: "I tried to make it clear."

The fact of the matter is that it was not in the realm of possibility for the court to clear the atmosphere of confusion and doubts in which the whole case was enveloped at the time, for the simple reason that the court was not in possession of the entire strange record of this strange case. Had all the facts been brought to the court's attention, Gryger's stammering protests would have acquired coherency and justification. Had Gryger been attended by counsel, the bizarre chronicle of fact which he was attempting to relate would have taken form and substance, and the protest would have acquired authenticity by the production of court documents affirming his protestations.

At one point in the proceedings, the judge, after discussing the purposes of the Fourth Offenders Act, said to the prisoner at the bar: "Now, that is the law, Gryger, isn't it?" If an attorney had been present, the attorney could well have interjected: "Your Honor, I respectfully submit that that is not the law, especially in view of the history of this case." That history we will discuss later in the opinion, but here we will consider the misapprehensions which induced Judge Kun mandatorily to impose a life sentence.

More than once Judge Kun indicated that his part in the solemn act of imposing life sentence was limited to ascertaining the identification of the prisoner and the acknowledgment of the four offenses, whereupon a stroke of the gavel, like the pushing of a button, would effectuate the intention of the statute in that case made and provided. Hence, he said: ". . . on the basis of the record in each of these cases, and on the basis of your acknowledgment of identity, it becomes my duty, under the Act of Assembly, to treat such a case, that is to say, where a person has been found guilty the fourth time of a felony within a prescribed period, to impose the sentence required by the Act."

A conscientious discharge of duty can work an injustice as much as a purposeful ignoring of one's responsibility if there is a misconception as to what one's duty is. It was never the intention of the Legislature that the commission of a fourth offense should automatically trip the lock, closing permanently the door of the penitentiary on the offender. If that had been the purpose of the lawmakers of the State, they would not have provided for appeal "as to alleged legal errors," and "as to the justice thereof [the life imprisonment]." The whole structure of phraseology in the statute imports a judicial hearing of a scope which would demand examination of the life story of the candidate for social extinction. It needs no example to demonstrate that a defendant could be guilty of even more than four felonies which, however, were committed under such circumstances as would negate the hardness of heart and cruelty of nature requiring perpetual immurement behind prison walls. Nor would it be difficult to understand that there could be a felon whose three crimes, or two, or even one (together with certain facts in his life), would recommend for him permanent isolation from society.

The record in this case discloses that there was not the slightest attempt made to pull back the curtains of time so that Gryger's past could be studied and evaluated in the processes of deliberation as to whether those past events revealed him to be a member of the human race beyond sociological redemption.

The writer of this Opinion was a member of the Pennsylvania Legislature when the subject of mandatory sentencing of fourth offenders as provided for by the New York Baumes Act was considered. The Commission appointed to study this phase of the contemplated legislation reported against any mandatory imposition of life imprisonment:

"The Baumes Act requires a judge to sentence a fourth offender in certain cases of felony to life imprisonment, leaving no discretion whatsoever to the court. This Commission has considered the matter carefully and is not at all convinced that it is wise to take such a drastic step as to tie the hands of the court, even though a man may be convicted of his fourth major offense. It is as true that some men should be imprisoned for life after their first offense as unregenerate criminals as it is true that other men after the commission of their fourth offense should not be locked up for the balance of their natural lives.

"When this matter was submitted to the Judicial Conference of this Commonwealth called by Chief Justice von Moschzisker it was unanimously resolved that it was the sense of the conference that a system of increasingly graduated penalties should be imposed, dependent upon the number of former convictions of the accused.

"This thought has been introduced into the Act now presented by this Commission, with permission vested in the trial judge to sentence to life imprisonment for a fourth conviction. Not only is such a sentence *not*

*made mandatory upon the judge,* but the propriety of such a sentence is reviewable by the upper court."

(Appendix to the Legislative Journal of 1929, Vol. III, pp. 6156-57.) (Emphasis supplied.)

Furthermore, the Fourth Offenders Act actually states that, under the circumstances there outlined, the life sentence shall be imposed "in the discretion of the judge trying the case." (Act of June 24, 1939, P. L. 872, Sec. 1108 (b), 18 PS 5108 (b)). The discretionary feature of this Act was passed upon here in 1939 in the case of *Comm. ex rel. Foster v. Ashe,* 336 Pa. 238, 240, where we said: "Relator finds fault with the Act because it vests in the court discretionary power to impose a sentence of life imprisonment, and he claims that this results in unfair discriminations. Nearly all sentences are discretionary, and must take into consideration the circumstances of the crime and the criminal record of the offender."

We quote with approval Judge LEVINTHAL'S observation in the court below that: ". . . every Pennsylvania fourth offender enjoys the right to a full hearing on the question of the propriety of a life sentence in his particular case. A judicious determination of this matter must be based upon an understanding of the defendant's background, the extent of his education, his age, mentality, temperament and health, as well as a consideration of the several crimes of which he stands convicted, their tendency to show anti-social characteristics, their violent or non-violent nature, the presence or absence of confederates, the motive for their commission, the amount of money or other property involved, and all the other factors and circumstances bearing upon the ultimate decision whether the interests of justice and the welfare of society require that the particular individual be incarcerated for the balance of his life."

Francis Gryger, not having received such a hearing, was in effect afforded no hearing at all. In view of the lower court's finding as above indicated, it was fully justified in granting the writ of habeas corpus. A reversal of the decision of the Superior Court in this respect is therefore in order.

The lower court added, at the termination of its opinion, that the district attorney's information charging the relator as a fourth offender remains in full force. A thorough and painstaking study of the entire record which, incidentally, was never before the Supreme Court of the United States or, until now, before the Supreme Court of Pennsylvania, raises more than considerable doubt as to the validity of the district attorney's information. None of the courts which have considered this case has passed definitively on the legal accuracy of the assertion that on November 27, 1944, Gryger was in reality a fourth felon offender.

When Gryger appeared in Court on July 26, 1943 to answer to certain pending criminal charges, his record on felonies showed that he had served a sentence of one year for burglary in 1927, an indeterminate sentence in a reformatory for breaking and entering with intent to commit a felony in 1929, and a five to ten year sentence for armed robbery, entering with intent to rob, beginning in 1930.

He was confronted in July, 1943, with 14 indictments: No. 461, June Sessions, 1943, charge burglary; No. 462, June Sessions, 1943, charge aggravated assault and battery; and 12 indictments (Nos. 251 to 262, July Sessions, 1943), charges burglary and receiving stolen goods. Although the 12 indictments (251 to 262) included the count of burglary, they were obviously drawn to cover the charge of receiving stolen goods alone, the detectives having found in the defend-

ant's room items of jewelry identified as having been taken from 8 different homes. There was no evidence of burglary against Gryger on these 12 indictments, [Nos. 251 to 262] nor was any attempt made to connect him with the alleged burglaries.

The burglary count embraced in Bill No. 461 consisted in fact of a charge of attempted burglary. At the time of arraignment on these 14 charges, Gryger had no lawyer, although he had requested one of the district attorney who remarked to him: "Counsel will be appointed at the proper time."

While still without a lawyer Gryger said to the District Attorney: "If the Court will accept my plea of guilty to one bill of indictment only to receiving stolen goods, I will plead guilty to that one bill only; but if the Court will not accept this plea to one bill and one bill only to receiving stolen goods, then my plea shall remain as not guilty as already entered." The district attorney spoke to the judge but there is nothing in the record to show the judge's reaction to this suggestion. The prisoner testified later that the judge nodded in approval when the district attorney spoke to him.

Following Gryger's consultation with the District Attorney, the defendant was placed on trial and the first witness had already been sworn and his testimony begun when the voluntary defender Herman I. Pollock arrived to undertake Gryger's defense. Detective Flanagan testified that on June 12, 1943, the defendant had appeared at the home of a Raymond Wilde and was about to break a window in that house when the next door neighbor, Harry Haas, arrived and tussled with him, this altercation being the basis for the aggravated assault and battery charge at No. 462. Gryger testified: "I am innocent as far as the burglary

is concerned. I admit I bought the stuff . . . As far as the burglaries are concerned, I don't know nothing."

It is to be kept in mind that Bill No. 461 is the crucial bill of indictment in the consideration of this appeal and it is also to be remembered that the only evidence as to burglary or attempted burglary was confined to Bill No. 461.

Although a jury was present in the box during the proceedings on July 26, 1943, there is no indication that the evidence from the witnesses was being submitted to them for consideration and deliberation. At the later hearing on the petition for writ of habeas corpus, Herman Pollock testified that Judge McDevitt "always swore in a jury the first thing in the morning and kept the jury there and did not use them in any case unless he went to trial. It was not his habit to submit the bills, but it was his invariable custom where he accepted the plea to consider the case was ended." Pollock also testified that "Judge McDevitt often accepted a plea to a lesser offense, and where he accepted such a plea, the greater offense was always treated as if it had been finally disposed of, as if it had been handed to a jury for a verdict of not guilty and a verdict of not guilty entered."

After the taking of testimony on this same day, July 26, 1943, Judge McDevitt turned to the defendant and said: "You pleaded guilty," and the defendant replied: "Yes, but I am not guilty of burglary." After further questioning of the defendant, the judge summed up the whole case with the remark: "Go back to the penitentiary. Five to ten in the penitentiary. You don't deserve to be out."

In view of the fact that 14 indictments were involved, the adjudication by the judge was grossly inadequate, although it was sufficiently authoritative

to serve as an official vehicle to carry Gryger to the penitentiary for a term of from five to ten years.

In the pronouncement of his judgment from the bench, a judgment, incidentally, which sounded more like the condemnation of an angry Jeffreys than the reasoned conclusion of a jurist, Judge McDevitt offered no enlightenment as to the particular indictment or indictments on which he was sentencing. Since the count of burglary in the indictments Nos. 251 to 262 was obviously eliminated, there being no accusation or evidence in court of any such charge, it can only be assumed that Judge McDevitt intended to sentence Gryger on the attempted burglary related in court at Bill No. *461*. The judge could not have been sentencing on the offenses of receiving stolen goods because the sentence on *that* crime is a "flat sentence" with incarceration in the county jail. (*Com. ex rel. Holly v. Ashe,* 166 Pa. Superior Ct. 599). But here the sentence was an *indeterminate* one and to the *penitentiary,* so that the inescapable conclusion is that Judge McDevitt was sentencing on the *attempted burglary charge,* No. 461. The court clerk, however, apparently knowing no more than was said in open court, and having heard the defendant plead guilty to receiving stolen goods, conjectured that the sentence applied to the charge of receiving stolen goods. He accordingly entered on the back of Indictment No. 251: The Defendant being arraigned, plead 7-26-43, Guilty 2nd Count. Dist. Atty. sim. et issue. Verdict 7-26-43. Sentence, not less than (2½) years nor more than (5) years at separate and solitary confinement in the Eastern State Penitentiary, to be computed from after un-expired sentence on Bill 1046 April 1937.

He wrote on the back of Indictment No. 252 the following: 7-26-43 The Defendant being arraigned, plead Guilty 2nd count. Dist. Atty. sim. et issue.

7-26-43, Sentence, not less than (2½) years nor more than (5) years at separate and solitary confinement in the Eastern State Penitentiary, be computed from after sentence on Bill 251 July, 1943.

Since the court had before it the entire 14 indictments on the day in question and since the judgment was an obvious all-embracive and final one, no matter how unjudicially spoken, it is clear that the court intended the proceedings to dispose conclusively of all 14 indictments (including No. 461). This conclusion is fortified by the fact that all 14 indictments were permanently removed from the trial docket. Furthermore, it must be noted that: (1) The cases were indexed; (2) No detainer was placed against the prisoner at the penitentiary for any outstanding indictment; (3) The clothing which the defendant was charged with wearing on the day of the attempted burglary (No. 461) and which were exhibits at the trial were returned to the prisoner at the penitentiary, on August 30, 1943.

Herman Pollock, veteran criminal lawyer and voluntary defense lawyer for many years,* testified at the hearing on the petition for writ of habeas corpus, that he was satisfied that the proceedings on July 26, 1943, disposed entirely of the 14 bills of indictment. His records bore out his statement "that this defendant was tried on Bills *461* and 463 and also on Bills of Indictment 251 to 262, inclusive, and that the matter was finally disposed of as to all those bills of indictment."

He testified that when he went into Courtroom No. 453 on July 26, 1943, he "went there to try two bills of indictment. These bills were Nos. *461,* June, 1943,

---

* Mr. Pollock had tried some one thousand cases before Judge McDevitt and had appeared in 5,000 criminal cases generally.

and 462, June 1943.)" His records further showed that there was no bill outstanding against Gryger after July 26, 1943. In addition to these records, Mr. Pollock stated that: "As a matter of fact, I would say that professionally I would not have agreed to having tried at all unless all bills were disposed of."

There appears not a vestige of doubt that the proceedings on July 26, 1943, were intended to clean the slate of all charges against Gryger and that the sentence of from 5 to 10 years (no matter how allocated), added to what the prisoner was already serving in the penitentiary, was to provide the entire punishment the defendant was to undergo for all crimes and offenses for which he was indicted to date.

And there is no doubt that the proceedings on July 26, 1944, would have terminated all proceedings against Gryger as of that date except for an episode which spotlighted him in his role as prisoner. In the early part of 1944 Gryger succumbed to the temptation of illegitimate freedom. The prison authorities broadcast that Gryger had scaled the prison walls and disappeared. A general alarm followed and the ensuing manhunt covered eight States. It developed five days later that the prisoner had not actually quitted the penitentiary but was hiding in the boiler room of the establishment. He was taken before a court in Montgomery County and sentenced to from one to two years for prison breach.

Official indignation over Gryger's escapade which had sent the forces of the law on a wild goose chase into the county round prompted the prosecuting authorities and particularly Judge McDevitt to look into Gryger's records in the courthouse. In this examination it was discovered that Indictment No. 461 (the one involving attempted burglary on the house of Wilde) carried no endorsement of final action.

Gryger was returned to the Court of Quarter Sessions in Philadelphia, taken into Courtroom No. 453 where he had appeared only eight months previously, and brought before the same judge who had tried and sentenced him. He was again charged with the same offenses of attempted burglary and assault and battery. Gryger spiritedly remonstrated that he had already been tried on these charges. As he spoke out: "Members of the Jury: as a citizen of the United States I demand—" three guards seized him and the Court ordered: "Make your statement to him, guilty or not guilty, I am going to hold you for contempt of court." The prisoner asked that the records of July 26, 1943, be presented, but his request was ignored.* He was then compelled to stand trial for the second time on the charge of attempted burglary at No. 461 and aggravated assault and battery at No. 462.

His voluntary defender at this second trial was not the one who had defended him at the first trial and consequently he was not armed with personal knowledge of the previous proceedings, nor did he know that much of the evidence now being presented had been introduced at the trial of July 26, 1943. Judge Mc-Devitt must have known that the case had already been before him because he had sent for the "notes of testimony." In his charge to the jury, Judge McDevitt stated that the charges were "attempted burglary" and

---

* At the hearing before him, Judge LEVINTHAL commented: "I have read the record and everything that you have said is supported by the record—there is no doubt about it—except that the record indicates clearly that you were sentenced on a plea of guilty to receiving stolen goods."

At the same hearing before Judge LEVINTHAL, the district attorney formally admitted for the record that the prisoner's attempts to inform the Court that he had already been tried with respect to Bill 461 "were repressed".

"assault and battery." The jury returned a verdict of guilty.

When the Judge ordered Gryger to the bar for sentence, the prisoner again protested his innocence of burglary or attempted burglary, but he did acknowledge that, as he had stated before, he was guilty of receiving stolen goods. At the termination of a short colloquy between the defendant and judge, the judge announced: "You are not fit to be in society. You are one of those fellows who won't reform. You have had every opportunity under the sun and you have abused it. At the expiration of what you are doing, do five to ten more. And I am going to have you indicted for a fourth offender, and give you life." This irate remark by Judge McDevitt about "life", aside from its injudiciousness, was a mere nullity. He had no jurisdiction to "give" the prisoner "life". The imposition of a life sentence under the Habitual Offenders Acts, supra, can only come after a certain procedure has been followed and does not depend on the personal pique of the presiding judge. Moreover, Judge McDevitt had no authority to sentence Gryger to 5 to 10 years additional imprisonment. If this imprisonment was intended as an amendment to the sentence recorded in July, 1943, the amendment was illegal since the term during which the original sentence had been entered had passed.* If he sentenced Gryger on the supposition that the trial in February, 1944, was the first trial of Gryger on Bill No. 461, the record contradicts him.

The notes of testimony of the proceedings of *Commonwealth v. Francis Gryger* held in Philadelphia on July 26, 1943, before the Honorable HARRY S. MC-DEVITT recite Bills of Indictment Nos. *461* and 462 of

---

* *Com. ex rel. Micholetti v. Ashe,* 359 Pa. 542.

June Sessions, 1943, as well as Bills of Indictment Nos. 251 to 262 inclusive, July Sessions 1943. The caption on these notes of testimony not only affirms that the proceedings included the consideration of Bills Nos. *461* and 462, but the testimony recites the incidents concerning the charges advanced in those bills. Furthermore, the transcript was filed and made part of the record of the burglary case at No. *461,* to which the defendant had pleaded not guilty.

And then it is to be noted particularly that the notes of testimony of the trial of February 25, 1944, carry the same caption of *Com. v. Francis Gryger* at June Sessions, 1943, *461* and 462.*

In the entire voluminous record of all the proceedings herein discussed, the only item that can be advanced in behalf of the contention that No. 461 was not definitively disposed of on July 26, 1943, is the lack of an endorsement on that indictment as to what occurred on that date. It would perhaps need to be conceded that if the indictment constituted the only written entry in the archives of the case, the integrity of the court records might prevail over oral testimony, or even official recollection as to what had occurred in Courtroom No. 453 on July 26, 1943. The facts, however, are otherwise. The notes of testimony, which are official and uncontradicted, reproduce accurately the disposition of the charge of attempted burglary (No. 461) on July 26, 1943. And then there are the items of the return of the exhibits, the withdrawal of the indictments from the pending files, and the other incontrovertible evidence, already referred to, of a *fait accompli.*

I am convinced that on July 26, 1943, Judge McDEVITT disposed of Bill of Indictment No. 461 and

---

* The judge suspended sentence on Bill No. 462.

that, therefore, the attempted retrial of Gryger on that same indictment in February, 1944, could have been legally intercepted by the plea of *autrefois acquit*. Although the lawyer, through ignorance of the previous conviction, made no formal objection to the retrial, it is of record that the defendant himself objected. His objection, which has not been contradicted, is one of substance and must be recognized.

The trial of February 25, 1944, being, therefore, a mere nullity, the sentence there imposed falls of its own weight, which thus leaves us with the sentence of July 26, 1943. I have shown that since the sentence was an indeterminate one with imprisonment in the penitentiary, it could not apply to the crime of receiving stolen goods which calls for a flat sentence with imprisonment in the county jail. The sentence, therefore, could only apply to attempted burglary and assault and battery.

The information on which Judge KUN based the sentence of life imprisonment enumerated the following offenses:

1. Burglary, June Sessions 1943—sentenced February 25, 1944, to a term of not less than 5 nor more than 10 years in the Eastern State Penitentiary.

2. Burglary. Sentenced March 17, 1929, to one year in the Maryland House of Correction.

3. Burglary. Sentenced April 23, 1929, to Huntingdon Reformatory.

4. Robbery with offensive weapon Nov. 28, 1930. Sentenced to not less than 5 nor more than 10 years.

5. Receiving stolen goods. Sentenced April 28, 1937, to imprisonment of not less than 18 months nor more than 3 years.

Since No. 1 item—the sentence imposed February 25, 1944, is null and void, and item No. 5 is not listed as a felony in the Habitual Offenders Act, it follows

38

that the information drawn by the district attorney on May 1, 1944 and presented to Judge KUN on November 27, 1944, did not list four felonies. This defect was a fatal insufficiency and the information should have been quashed.

Francis Gryger, therefore, was not a fourth felony offender and was not subject to the Habitual Offenders Act.

I would not only reverse the decision of the Superior Court but I believe this Court should further order that:

1. The information of May 1, 1944 be quashed;

2. The life sentence of November 27, 1944 be vacated;

3. The sentence of February 26, 1944 be vacated;

4. The prisoner be discharged when he will have served out the sentence imposed on July 26, 1943, following the expiration of the sentence at Bill No. 1046, April, 1937 and the sentence imposed for prison breach. (No. 144 November, 1943, Montgomery County)